FILED

2021 Nov-12  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |
|---|---|
| HUNTER CREGER, individually and on behalf of all others similarly situated, *et al.* | Civil Action No.: |
| *Plaintiffs,* | |
| v. | |
| UNITED LAUNCH ALLIANCE, LLC; | |
| *Defendant.* | |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

United Launch Alliance ("ULA") recently announced that its employees must receive a COVID-19 vaccine by October 29, 2021, or face termination. Plaintiffs represent a class of ULA employees with religious and medical objections to receiving that vaccine. Each Plaintiff requested a religious or medical accommodation (or both), but ULA responded by denying all religious accommodation requests and most medical accommodation requests.  In doing so, ULA violated its obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA") to provide reasonable accommodations. And for those still employed as of November 4 due to pending appeals, it also violated the recently-enacted Alabama Act 2021-561.

Each Plaintiff has filed administrative claims with the Equal Employment Opportunity Commission ("EEOC") challenging ULA's discriminatory practices. Those claims remain pending, and this Motion asks only that the Court suspend the timeline of ULA's vaccine mandate temporarily for those who requested religious or medical accommodations to allow the EEOC

sufficient time to complete its review of Plaintiffs' claims. To be clear: Plaintiffs do not challenge the vaccine mandate itself through this action. They merely ask the Court to require ULA to follow federal law and grant reasonable accommodations to the vaccine mandate, and to follow Alabama law and not terminate employees who have indicated their intent to appeal denial of their requests for accommodation to the Alabama Department of Labor.

Unless the Court temporarily enjoins ULA's mandate for all employees with religious or medical reasons for seeking an accommodation, Plaintiffs and hundreds of others similarly situated will suffer harms that neither the EEOC, the Alabama Department of Labor, nor this Court can remedy. Facing the risk of lost income, many ULA employees may opt to receive the vaccine, despite their religious beliefs or health concerns. Other employees may suffer such significant harms that monetary damages will be insufficient as a remedy. These injuries include loss of mortgage eligibility, the inability to continue paying for life-saving medical care, and the loss of health insurance. The Court should exercise its equity jurisdiction to temporarily enjoin ULA's vaccine mandate for those with religious or medical reasons for seeking an accommodation "to preserve the court's ability to later order meaningful relief." *Drew v. Liberty Mut. Ins.*, 480 F.2d 69, 72, 74 (5th Cir. 1973).[1]

## BACKGROUND

By Spring 2020, COVID-19 was spreading rapidly around the world. At that time, ULA began implementing certain mitigation procedures for its workforce, including working remotely and requiring on-site employees to wear masks and maintain distance from others. *See*, *e.g.*, Eastman Aff. ¶ 6. Since then, at least three separate COVID-19 vaccines have been developed and authorized for emergency use in the United States.

---

[1] The former Fifth Circuit's decisions prior to the circuit split are binding in the Eleventh Circuit "absent an intervening Supreme Court decision or en banc circuit decision." *W. Alabama Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1318 (M.D. Ala. 2015) (quoting *Monroe Cnty., Florida v. U.S. Dep't of Labor*, 690 F.2d 1359, 1363 (11th Cir.1982)).

The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine in December 2020. *See* Michael Erman, *U.S. FDA Authorizes Pfizer COVID-19 Vaccine for Emergency Use*, REUTERS (Dec. 11, 2020), https://www.reuters.com/article/us-health-coronavirus-fda-pfizer/u-s-fda-authorizes-pfizer-covid-19-vaccine-for-emergency-use-idUSKBN28L1IG. A week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine. *See Moderna COVID-19 Vaccine*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine ((last visited Nov. 8, 2021). Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. *See Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA For Emergency Use – First Single-Shot Vaccine in Fight Against Global Pandemic*, JOHNSON & JOHNSON (Feb. 27, 2021), https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-emergency-usefirst-single-shot-vaccine-in-fight-against-global-pandemic. On August 23, 2021, the FDA issued full approval for the Pfizer vaccine Comirnaty for individuals 16 years of age and older. *See Comirnaty and Pfizer-BioNTech COVID-19 Vaccine*, U.S. FOOD & DRUG. ADMIN., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine (last visited Nov. 8, 2021). Because that vaccine is not available in the United States, the only vaccines that are currently available are those with Emergency Use Authorization.[2]  Federal law requires that individuals to whom a vaccine with only Emergency Use Authorization is to be administrated be informed, *inter alia,* "of the option to accept or refuse administration of the product…."  21 U.S.C. § 360bbb-

---

[2] *See* Press Release, FDA Does a Bait and Switch with COVID Shots, Liberty Counsel (Aug. 27, 2021), https://lc.org/newsroom/details/082721-fda-does-a-bait-and-switch-with-covid-shots-1?fbclid=IwAR1RB-eitQvXbxqINDXwtGF50fxj27cn5gLW1Bswnj0bkhdogAK-SI6_UJU. Liberty Counsel is currently litigating this issue in the U.S. District Court for the Middle District of Florida. *See* Complaint, *Navy SEAL 1 v. Biden*, No. 8:21-cv-02429 (M.D. Fla.).

3(e)(1)(A)(ii)(III).[3] ULA has not given Plaintiffs the "option" of accepting or refusing administration of" the COVID vaccines.

On August 25, 2021, ULA announced that all employees—even those who already had the disease and are still immune—would be required to receive a COVID-19 vaccine by October 29. Eastman Aff. ¶ 7; Maine Aff. ¶¶ 6, 12. ULA's mandate is absolute; there is no alternative for working remotely, periodic testing, mask wearing, or social distancing—even for employees who have recovered from COVID-19 and possess antibodies. Absent accommodation, which ULA has denied *en masse*, employees must choose vaccination or termination.

When ULA announced the vaccine mandate, it stated that employees could request accommodations for religious or health reasons. And ULA's CEO expressly indicated that those who had previously been infected with COVID would be able to obtain a medical exemption upon proof of a positive serology test.  Eastman Aff. ¶ 11.  But shortly before the self-imposed vaccine deadline, ULA denied all requests for religious accommodation and all requests for medical exemption based on positive serology tests, claiming that the large number of requests would place an undue burden on the company.  Eastman Aff. ¶ 14 and Ex. E; Creger Aff. ¶ 14 and Ex. B; Breland Aff. ¶ 15 and Ex. B; Maine Aff. ¶ 15 and Ex. B; Norwood Aff. ¶ 14 and Ex. C.

According to ULA, this vaccination mandate will increase employee safety. See Eastman Aff. ¶ 8 and Ex. A.  But ULA does not require its customers and visitors to be vaccinated. See *id.* ¶¶ 8-10 and Exs. A & B ¶ 2.1.  And it does not require testing of those who have been vaccinated, even though the Centers for Disease Control has acknowledged that the existing vaccines do not prevent infection or transmission of the Delta variant of the COVID virus.  *See, Delta Variant:*

---

[3] The law also requires that individuals be informed "of the consequences, if any," of refusing the vaccine. ULA is apparently of the view that "consequences" could include termination from employment, but much more likely that the phrase simply refers to the *medical consequences* should one become infected with the designed that the vaccine would purportedly prevent.

*What We Know About the Science*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (last updated Aug. 26,

2021) ("Fully vaccinated people with Delta variant breakthrough infections can spread the virus to

others.").Plaintiffs are five ULA employees in varying positions and working environments.

Plaintiffs Eastman and Norwood are engineers who have been working remotely or in cubicles

separated from co-workers by plexiglass since the onset of the COVID pandemic in March 2020.

See Eastman Aff. ¶¶ 2-6; Norwood Aff. ¶¶ 2-6. Plaintiff Maine is a Quality Inspector, who works

at a desk on the spacious manufacturing floor and separated from others by a distance of more

than six feet, or conducting hardware inspections while masked and social distanced from others.

See Maine Aff. ¶¶ 3, 5. Plaintiffs Breland and Creger are technician/welders, whose work consists

of welding parts and assemblies for the Centaur III and V lines while physically separated from

other workers. See Breland Aff. ¶¶ 3, 5-6; Creger Aff. ¶¶ 3, 5. Each Plaintiff requested a

reasonable accommodation from ULA's vaccine mandate for sincerely-held religious or medical

reasons, or both. Eastman Aff. ¶ 12; Breland Aff. ¶¶ 12-13; Creger Aff. ¶ 11; Maine Aff. ¶¶ 12,

14; Norwood Aff. ¶ 12.

Despite each Plaintiff working in a different environment—remotely from home, in

cubicles separated from co-workers by plexiglass, or in large open spaces[4]—ULA failed to

discuss possible accommodations, responding only with a blanket denial of their accommodation

requests and by placing Plaintiffs on unpaid administrative leave pending resolution of their

appeals. See

Eastman Aff. ¶¶ 14, 16 and Ex. C; Breland Aff. ¶ 15 and Ex. B; Creger Aff. ¶¶ 13, 15 and

Ex. B; Maine Aff. ¶¶ 13, 15, and Ex. B; Norwood Aff. ¶¶ 14, 16 and Ex. C.

. ULA has now terminated or will soon be terminating Plaintiffs before appeals to the

---

[4] Breland Aff. ¶ 3; Cregar Aff. ¶ 5; Eastman Aff. ¶ 3; Maine Aff. ¶ 3; Norwood Aff. ¶¶ 3, 5.

Alabama Department of Labor are resolved, in violation of Alabama Act 2021-561.

As discussed in the accompanying declarations, ULA's discriminatory and retaliatory actions impose significant personal and professional harms on each Plaintiff. Each Plaintiff will suffer immediate financial hardship if they lose their regular income stream. *See, e.g.*, Eastman Aff. ¶¶ 24-28; Breland Aff. ¶¶ 19-20; Creger Aff. ¶ 19; Maine Aff. ¶¶ 20-22; Norwood Aff. ¶¶ 22-25.

. Mr. Norwood's daughter has two congenital heart defects that require consistent medical evaluation, for example.  Norwood Aff. ¶ 23.   Mrs. Maine's husband suffers from chronic medical conditions for which he has incurred an increase in physical episodes due to the stress caused by ULA's actions. Maine Aff. ¶ 21.  Moreover, ULA's actions have brought significant stress and trauma into Plaintiffs' lives. *See, e.g.*, Breland Aff. ¶ 19; Maine Aff. ¶ 21.

## STANDARD OF REVIEW

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must establish: (1) a substantial likelihood of success on the merits; (2) the TRO or preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (4) the TRO or preliminary injunction would not be averse to the public interest.  *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1035 (11th Cir. 2001).  The purpose of preliminary injunctive relief is to preserve the status quo between the parties and to prevent irreparable injury until the merits of the lawsuit can be reviewed. *All Care Nursing Serv. v. Bethesda Mem'l Hosp.*, 887 F.2d 1535, 1537 (11th Cir. 1989).  "[F]inding a substantial likelihood that movant will ultimately prevail on the merits does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed.*

& *Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979) (citation and quotation marks omitted). "Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others." *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

## ARGUMENT

### I.     EEOC Review is No Obstacle Here to Preliminary Injunctive Relief.

Each Plaintiff has a pending charge with the EEOC complaining of ULA's discriminatory and retaliatory actions. See

Eastman Aff. ¶¶ 23-24 and Exs. L, M; Breland Aff. ¶18 and Ex. C; Creger Aff. ¶¶ 17-18 and Exs. C, C; Maine Aff. ¶¶ 18-19 and Exs. D, E; Norwood Aff. ¶¶ 19-20 and Exs. G, H.

. This does not prevent an injunction against ULA's current course of actions. While individuals asserting claims under Title VII or the ADA must complete the EEOC's administrative process before seeking "final relief" through a civil action, courts may grant preliminary injunctive relief on those claims where "irreparable injury is shown and likelihood of ultimate success has been established[.]" *Drew v. Liberty Mutual Insur. Co.*, 480 F.2d 69, 71-72 (5th Cir.1973); *Hicks v. Dothan City Bd. of Educ.*, 814 F. Supp. 1044, 1052 (M.D. Ala. 1993); *but see McGee v. Purolator Courier Corp.*, 430 F. Supp. 1285, 1286–87 (N.D. Ala. 1977) (distinguishing *Drew*)).  In such cases, an "individual employee may bring her own suit to maintain the status quo pending the action of the [EEOC] on the basic charge of discrimination." *Drew*, 480 F.2d at 72; *see also id.* at 74 (preliminary injunctive relief is necessary "to preserve the court's ability to later order meaningful relief.").

Other courts outside this Circuit agree. The Second Circuit explained that where, as here, "the court eventually will have jurisdiction of the substantive claim and an administrative tribunal has preliminary jurisdiction, the court has incidental equity jurisdiction to grant temporary relief to

preserve the status quo pending the ripening of the claim for judicial action on its merits."

*Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981). The First Circuit and

several district courts have also held that plaintiffs may obtain injunctive relief during the EEOC

process. See *Bailey v. Delta Air Lines*, 722 F.2d 942, 944 (1st Cir. 1983); *Sughrim v. New York*,

503 F. Supp. 3d 68, 96 (S.D.N.Y. 2020) ("[T]emporary injunctive relief is available on Title VII

claims before a plaintiff receives a right to sue letter from the EEOC[.]"); *Rogers v.*

*Commonwealth of Pa.*, No. 2:97-cv-6627, 1997 WL 793585, at *3 (E.D. Pa. Dec. 9, 1997) ("42

U.S.C. § 2000e-5(f)(2) does not divest an individual plaintiff of the right to seek injunctive relief

during an EEOC investigation."); *Hilliard v. BellSouth Med. Assistance Plan*, 918 F. Supp. 1016,

1026 (S.D. Miss. 1995) (holding that a plaintiff may "proceed [on an ADA claim] without first

exhausting the EEOC's administrative process" where there is a showing of irreparable injury);

*Baily v. Dallas Cnty. Sch.*, No. 3:16-cv-1642-M, 2016 WL 7638146, at *2 n.4 (N.D. Tex. Dec. 9,

2016) ("Exhaustion of administrative remedies in the ADA context is similarly a condition

precedent rather than a jurisdictional prerequisite to suit.").

The U.S. District Court for the Northern District of Illinois recently issued a temporary

restraining order in an analogous case. In *Doe v. Northshore Univ. HealthSystem*, fourteen people

employed by a hospital sought religious exemptions under Title VII from its employer's vaccine

mandate. After filing charges with the EEOC but before the EEOC made a decision, the

employees filed a lawsuit asking for injunctive relief while the EEOC was deciding what to do.

On November 1, 2021, the court granted the temporary restraining order. *See* Temporary

Restraining Order, *Doe v. Northshore Univ. HealthSystem*, No. 1:21-cv-05683 (N.D. Ill. Nov. 1,

2021).[5]

---

[5] The plaintiffs in *Doe* sought injunctive relief for themselves and all others similarly situated. While the court declined to grant the motion as to the class at that time, it did not preclude the plaintiffs from raising the class allegations at the preliminary injunction state. *See id.* at 3.  The District Court for the Northern District of New York likewise issued first a TRO and then a preliminary injunction blocking New York's vaccine mandate for health care workers.  *See* Order,

This conclusion is consistent with the history of Title VII. *See Sheehan*, 676 F.2d at 881. Before Title VII was amended in 1972, "the sole right to enforce Title VII in the courts was given to the person aggrieved[,]" including seeking preliminary injunctive relief. *Id*. at 882–86. In 1972, Congress amended Title VII to "explicitly authorize[ ] the EEOC to 'bring an action for appropriate temporary or preliminary relief' at any time, regardless of the status of any informal negotiation[.]" *Id*. at 881 (quoting 42 U.S.C. § 2000e-5(f)(2)). While Congress did not add a "comparable provision with respect to individuals," the history of the provision shows there was no need for it: "[R]eading the statute as a whole, and having due regard for Congress's intent in enacting Title VII, . . . courts [are] entitled to use [their] inherent equity power to award temporary injunctive relief, in appropriate circumstances, in order to maintain the status quo prior to the EEOC's issuance of a right to sue letter." *Id*.; *see also Drew*, 480 F.2d at 74 (concluding that Congress's silence should not be interpreted as "impliedly destroy[ing] an existing right of action"). As the Supreme Court has explained elsewhere, there is "a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels. . . . Such power has been deemed merely incidental to the court's jurisdiction to review final agency action[.]" *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (quotation marks omitted).

Preliminary injunctive relief is imperative to maintain the status quo here. Without such relief, the Plaintiffs faced an impossible choice—one for which the EEOC and this Court will have no remedy. Some Plaintiffs were required to decide by November 7, 2021, and others will be required to decide shortly thereafter, whether to receive the COVID-19 vaccine or face

---

*Dr. A. v. Hochul*, No. 21-cv- 1009 (N.D.N.Y. Sept. 14, 2021); Order, *id.* (Oct. 12, 2021). The Second Circuit subsequently vacated those orders on November 4, 2021, stressing that it was not "decid[ing] the ultimate merits of Plaintiffs' legal claims or of the State's defenses; rather, [it was making] a limited determination with respect to preliminary relief based on the limited factual record presently before this Court." <u>We The Patriots USA, Inc. v. Hochul</u>, No. 21-2179, 2021 WL 5121983, at *2 (2d Cir. Nov. 4, 2021).
.

termination. It is understandable that ULA employees may be considering acquiescing to the

mandate, as many have already been coerced into doing, thereby risking their health and/or their

conscience in favor of their livelihood. If the Court does not enter preliminary relief for those

employees with religious or medical reasons for seeking an injunction and those employees

determine that they must forsake their consciences or health to maintain their income, that

decision cannot be reversed or remedied by a subsequent EEOC decision. Moreover, Plaintiffs

face many other immediate harms for which the Court will not be able to fashion a remedy later.

"[T]o preserve [this] court's ability to later order meaningful relief," it must enter preliminary

injunctive relief now. *Drew*, 480 F.2d at 74.

II.    **Preliminary Injunctive Relief is Appropriate and Necessary to Remedy ULA's Ongoing Violation of Federal Law.**

A. Plaintiffs are likely to succeed on the merits of their Title VII claims.

ULA has violated Title VII in at least two ways. First, the company discriminated against

Plaintiffs by failing to engage in any interactive process about possible accommodations.  Second,

ULA denied all religious accommodation requests.

Title VII prohibits an employer from discriminating against an employee "because of such

individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). This "includes all aspects of religious

observance and practice, as well as belief, unless an employer demonstrates that he is unable to

reasonably accommodate an employee's . . . religious observance or practice without undue

hardship on the conduct of the employer's business." *Id*. § 2000e(j); *see Walden v. Centers for

Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012). Once the employee has

notified his employer of a conflict between a particular work requirement and his religious belief,

there should be a "good faith dialogue … about what religious accommodations may be

necessary." *Chandler v. Infinity Ins. Grp.*, No. 2:12-CV-2870-TMP, 2014 WL 2547826, at *7

(N.D. Ala. June 4, 2014); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (After receiving an accommodation request, "the employer is obligated by law to engage in an interactive process—a meaningful dialogue with the employee").  The employer must offer a "reasonable accommodation," which then "triggers a duty on the part of the employee to make a good faith attempt to satisfy his needs through the offered accommodation." *Telfair v. Fed. Exp. Corp.*, 567 F. App'x 681, 684 (11th Cir. 2014). ULA failed to engage in any interactive dialogue about possible accommodations and failed to offer any reasonable religious accommodations. As such, Plaintiffs are likely to succeed in showing that ULA violated Title VII.

Under Title VII, Plaintiffs "must first establish a prima facie case of religious discrimination." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007).  In order to establish a prima facie case of religious discrimination based on a failure to accommodate, Plaintiffs must show that: (1) they have bona fide religious beliefs that conflict with an employment requirement; (2) about which they informed ULA; and (3) they suffered an adverse employment action for failing to comply with the conflicting employment requirement. *Id*.  Plaintiffs are likely to succeed on each prong, as none are in dispute.

On the first prong, ULA has already admitted that the requests it received for religious accommodation were based on "sincerely held" religious beliefs because, in its notice of denial of those requests, it expressly acknowledged that it was denying the requests for accommodation in part based on "the high volume of requests to accommodate that qualified under the sincerely held belief prong of the analysis." *See, e.g.*, Creger Aff. Ex. B 1.  None of the Plaintiffs had their requests denied on the ground that their religious beliefs were not sincerely held.  *See, e.g.*, Eastman Aff. Ex. G 1.  Similarly, by responding to the requests for accommodation, ULA has acknowledged that it was informed of the religious conflict, and there is likewise no dispute that adverse employment actions have been or will soon be taken against each of the Plaintiffs.

The burden therefore shifts to ULA to demonstrate that it "is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007) (quoting 42 U.S.C. § 2000e(j); *Beadle*, 29 F.3d at 591-92). Yet ULA offered no accommodations, simply asserting that it had received too many requests to be able to make any accommodation without suffering an "undue hardship." Its asserted ground for undue hardship was the following:

> the need to ensure a healthy and safe workplace; the time, cost, and administration burden associated with weekly testing; potential issues with the availability of testing; ULA's requirements as a federal government contractor, including NRO requirements to staff contracts with vaccinated workers; the need to comply with strict contract requirements, including launch schedules, and the potential financial risks of failure to satisfy such requirements; the nature of our workplace and business, including the need for on-site work; the need for employees to interact with others, travel, and access customer facilities, including federal facilities with strict access requirements; the number of prior COVID cases and quarantines at ULA, including multiple hospitalizations and deaths; and the presence of continued active COVID-19 cases and quarantines at ULA despite prior safety measures.

Eastman Aff. Ex. G 1-2. Each of the Plaintiffs received denials containing the identical language, and ULA made no effort to, among other things, distinguish between employees who could (and have been) working remotely, to assess whether masks and social distance requirements would have been viable for those whose positions required on-site work, or to address the fact that those with prior COVID infection had immunity from the disease at least as great as those who have

been vaccinated, with no significant risk of transmission to others.  Although the phrase,

"reasonably accommodate," is not defined in the statute, the Eleventh Circuit has held that

whether the employer has offered a reasonable accommodation "must be determined on a case-by-

case basis." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321–22 (11th Cir.

2007) (quoting *Beadle*, 29 F.3d at 592).  ULA's refusal to engage *at all* with Plaintiffs on possible

accommodations makes it likely that ULA would not be able to carry its burden on the "undue

burden" prong, and that Plaintiffs would therefore prevail here as well.  *See*, *e.g.*, *Bultemeyer v.

Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("courts should look for signs of

failure to participate in good faith or failure by one of the parties to help the other party determine

what specific accommodations are necessary" and "[a] party that fails to communicate . . . may

also be acting in bad faith").  Indeed, the only reason not to have engaged in an interactive process

was that ULA never intended to provide an accommodation.

ULA also failed to offer *any* accommodations, much less reasonable ones. Forcing

employees to be vaccinated in violation of their religious beliefs or to be deemed "voluntarily

resigned" is clearly termination. But this cannot be reasonable because a "[r]easonable

accommodation is by its terms most logically construed as that which presently, or in the

immediate future, enables the employee to perform the essential functions of the job in question."

*Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003) (quoting *Duckett v. Dunlop Tire Corp.*, 120

F.3d 1222, 1226 (11th Cir.1997)).

ULA may seek to rely on the Supreme Court's decision in *TWA v. Hardison*, 432 U.S. 63

(1977), where the Court held that requiring an employer "to bear more than a de minimis cost" in

order to accommodate an employee "is an undue hardship." *Id*. at 84. But *Hardison* differs

substantially from this case. First, unlike *Hardison*, ULA did not attempt to determine the cost of

accommodating its employees. Second, the employee in *Hardison* sought a religious

accommodation that would have required the employer to breach a collective-bargaining agreement or pay other employees' overtime to cover the shifts. *Id*. at 76-77. In that context, such burdens exceeded a "de minimis cost" and constituted an "undue hardship." *Id*. at 84.[6]

In contrast, Plaintiffs here wish to continue working their jobs without being required to violate their conscience. They are not asking for any accommodation that places a hardship on ULA. Indeed, there are a host of reasonable accommodations that are not unduly burdensome, including: working remotely, mask wearing, periodic testing for COVID-19 antibodies, or periodic COVID-19 testing. Even the recent federal order regarding vaccine mandates for private employers contemplates testing as a viable option. *See Path Out of the Pandemic, President Biden's COVID-19 Action Plan*, THE WHITE HOUSE, https://www.whitehouse.gov/covidplan/. Along those lines, the European Union's digital COVID-19 certificate considers vaccination equivalent to a negative COVID-19 test or having previously recovered from COVID-19. See EU Digital COVID Certificate, EUROPEAN COMM'N, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en. Other options abound, which is why an arbitrary, across-the-board denial of requests for "accommodation" finds no support in *Hardison*—ULA cannot identify a hardship associated with other accommodation possibilities it did not consider.

### B. Plaintiffs are likely to succeed on the merits of their ADA claims.

ULA also violated the ADA in at least two ways. ULA failed to engage in the interactive process or to provide employees with reasonable medical accommodations.

The ADA prohibits discrimination in employment on the basis of disability.  "To establish

---

[6] It is also worth noting that four of the conservative-leaning justices on the United States Supreme Court have indicated that *Hardison* may need to be reexamined. *Kennedy v. Bremerton Sch. Dist.*, 139 S.Ct. 634, 639 (2019) (Alito, J, joined by Thomas, Gorsuch, and Kavanaugh, JJ.). With the confirmation of Justice Barrett, the Court may have the fifth vote needed to reexamine *Hardison*.

a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007).  To be "disabled," one must demonstrate that he or she has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," a "record of such an impairment," or is "regarded as having such impairment." *Bragdon v. Abbott*, 524 U.S. 624, 630 (1998) (citing 42 U.S.C. § 12132). To be a "qualified individual" under prong two, a plaintiff must be "someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at 1256 (quoting 42 U.S.C. § 12111(8)).  In other words, "an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, ... that he can perform the essential functions of his job with a reasonable accommodation." *Id.*  As for prong three, "unlawful discrimination" includes "not making reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an … employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business …." *Id.* at 1262 (quoting  42 U.S.C. § 12112(b)(5)(A)).  To prevail on a "failure to accommodate" claim, in addition to showing he is a qualified individual with a disability, a plaintiff must show that he made a specific request for a reasonable accommodation; and his employer failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable accommodation. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1435, 209 L. Ed. 2d 155 (2021).

The Plaintiffs are likely to satisfy each of these requirements. The ADA defines "disability" as unable to perform one or more major life functions, including "work."  For those

Plaintiffs who have antibodies from a prior COVID infection, there is no reason to incur any of the additional risk that inheres in any vaccine (and, as the most recent evidence indicates, particularly with this vaccine) that could well *cause* the very infection and threat to ability to work that the vaccine is purported to obviate.  Further, "disability" can "[d]oubtless" include certain "reactions to vaccines [that are] severe enough . . . to rise to the level of a disability under the ADA." *Id*. at 165. *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 16–-65 (S.D.N.Y. 2020) (citing 29 C.F.R. § 1630.2(j)(1)(vii)).  A "qualified individual with a disability" is anyone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" *Chevron*, 570 F.3d at 614. Plaintiff Maine, who sought a medical exemption on the basis of positive serology test faces an unnecessary risk and little to no benefit by receiving the COVID-19 vaccine. *See, e.g.*, Maine Aff. ¶ 12 and Ex. A. Plaintiff Breland suffers from a generalized anxiety disorder which his physician certified limits his ability to take vaccination.  Breland Aff. ¶ 13 and Ex. A.  But they are still able to perform the essential functions of their jobs. *See id*. Plaintiffs are thus likely to satisfy the first two prima facie case requirements.

For the third prong, "The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate reasonable accommodation." *Hudson v. Tyson Farms, Inc.*, 769 F. App'x 911, 919 n.11 (11th Cir. 2019) (quoting U.S. Equal Emp. Opportunity Comm'n, EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002)); *see also* 29 C.F.R. § 1630.2(o)(3) (2007) (providing that, in order to determine the appropriate reasonable accommodation, it may be necessary for an employer "to initiate an informal, interactive process with the qualified individual with a disability in need of an accommodation" to identify the person's limitations and possible accommodations).  ULA did not engage in any

interactive process to ascertain whether, on a case-by-case basis, reasonable accommodations were available that would not impose an undue burden on ULA.  That alone constitutes a violation of the ADA.

Moreover, even had ULA engaged in an interactive process, it is unlikely to prevail on its assertion that there were no reasonable accommodations that would not create an undue burden on it.  As ULA's CEO has already admitted, those with antibodies from a prior COVID infection have resistance to reinfection and transmission that is at least as great as those who get vaccinated, so an exemption from ULA's vaccine mandate would be a reasonable accommodation with zero cost to ULA.  Eastman Aff. ¶ 11.  For those without antibodies, there are likely a number of possible accommodations—such as working remotely, social distancing and masks, temperature checks, and periodic COVID testing—that could be implemented without creating an undue burden on ULA.   ULA will again be unable to rely on *Hardison*, as the ADA sets forth an even more stringent "undue hardship" standard than exists under Title VII. *See* 42 U.S.C. § 12111(10)(A) ("[Under the ADA], the term 'undue hardship' means an action requiring significant difficulty or expense."). ULA would not likely be able to identify any "significant difficulty or expense" associated with granting accommodations to allow employees who requested medical accommodations to continue working with mitigation measures in place like mask wearing, periodic antibody testing, or periodic COVID-19 testing, or working remotely for those whose positions do not require on-site work. Accordingly, Plaintiffs are likely to succeed in showing that ULA violated the ADA by failing to engage in the interactive process and by failing to provide reasonable accommodations.

### C. Plaintiffs are likely to succeed on the merits of their claims under Alabama Act 2021-561.

ULA has also violated newly-enacted Alabama Act 2021-561.  That law requires employers to liberally construe employees' eligibility for religious and/or medical exemption,

allows employees to appeal denials of their requests to the Alabama Department of Labor, and forbids employers from terminating or diminishing the compensation of employees while their appeals are pending.  ULA's placement of employees on unpaid administrative leave, and its termination of others, prior to resolution of any appeals authorized by the Act, is therefore a clear violation.

### C. Without preliminary injunctive relief, Plaintiffs will suffer irreparable injury.

ULA has put its religious and disabled workers in an impossible position—take the COVID-19 vaccine, at the expense of their conscience and health, or be terminated. Unless the Court enjoins ULA's actions, Plaintiffs will be irreparably harmed.

An irreparable harm is one that cannot be undone, and an injunction is appropriate if the "anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975); *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1288 (S.D. Fla. 2020) (quoting *Chacon*). In this case, Plaintiffs face many harms that warrant preliminary injunctive relief. Most significantly, ULA is using a short deadline, coupled with the threat of termination, to compel its employees to violate their conscience or put their health at risk. Without vaccination in a matter of days, ULA employees face (or faced) effective termination.

The Hobson's choice to which ULA forced its employees has already resulted in a number of employees—whom ULA has admitted had sincerely-held religious objections to the vaccine— succumbing to ULA's mandate in violation of their conscientious objection to the vaccine instead of suffering the loss of income, which would put them at risk of violating another religious duty, namely, to provide for one's family.  *See, e.g.*, 1 Timothy 5:8 ("But if anyone does not provide for his relatives, and especially for members of his household, he has denied the faith and is worse than an unbeliever."). Although they, too, will have Title VII and/or ADA claims, as well as Alabama claims, against ULA for failing to grant reasonable accommodations, they are not part of

the present action because the harm to them has already occurred and cannot be undone.  But they nevertheless provide a good example of the irreparable harm to which the current Plaintiffs are being subject.  Understanding the irreparable nature of such harms, the United States District Court for the Northern District of Illinois recently issued a temporary restraining order in an analogous case.  *See* Temporary Restraining Order, *Doe v. Northshore Univ. HealthSystem*, No. 1:21-cv-05683 (N.D. Ill. Nov. 1, 2021).

A survey of the accompanying declarations further demonstrates the immediate harm ULA is about to inflict on its employees. For example, if he is terminated, Mr. Eastman will likely lose his eligibility for a mortgage as he and his wife, pregnant with their first child, are seeking to purchase their first home.  Eastman Aff. ¶¶ 25-26. Mrs. Maine will lose the income and medical insurance that she currently uses to pay for her husband's chronic medical conditions, and the stress caused by ULA's actions has already increased the number of physical episodes her husband is incurring. Maine Aff. ¶¶ 20-21. Mr. Breland, who is the sole provider for his stay-at-home wife and their two young children, reports that the loss of income and insurance "is very traumatic" for his family.  Breland Aff. ¶ 19.   Moreover, the loss of income will undermine another religious duty that several of the named Plaintiffs have identified, namely, the duty to provide for one's family.  Eastman Aff. ¶ 28; Breland Aff. ¶ 20; Maine Aff. ¶ 22; Norwood Aff. ¶ 25.

Considering such significant and immediate harms facing Plaintiffs and other ULA employees, it is unsurprising that employees may consider violating their beliefs or compromising their health to receive the vaccine. If they do so, the Court cannot fashion a remedy for that at a later date. Moreover, the financial harms themselves warrant preliminary injunctive relief. While the irreparable injury analysis does not typically consider harms that can be "undone through monetary relief," *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018), it is equally true

that "a month without a paycheck [is] a serious hardship," *Burlington N.*, 548 U.S. at 72. Many aspects of these financial harms are not easily redressed by damages—loss of mortgage eligibility, for example.  Eastman Aff. ¶ 26. That says nothing about the myriad non-financial harms that accompany the loss of a paycheck, such as: stress-induced increase in physical episodes from an underlying medical condiction (Maine Aff. ¶ 21); and family trauma (Breland Aff. ¶ 19.

The Court may prevent each of these harms by granting preliminary injunctive relief. Again, Plaintiffs do not here challenge ULA's ability to institute a COVID-19 vaccine mandate generally. They merely ask that ULA comply with federal law by engaging in an interactive process with individuals needing religious or medical accommodations and by granting reasonable accommodations for those individuals, and with Alabama law by not terminating them pending any appeals authorized by Alabama Act 2021-561. By enjoining ULA's vaccine mandate for those employees with religious or medical bases for requesting accommodations, the Court will ensure that it is able to fashion an appropriate remedy at a later date. If the Court does not do so, several Plaintiffs (and likely numerous other ULA employees) will suffer irreparable harms.

### D. Plaintiffs' injury outweighs any potential hardship to ULA.

The harms discussed above are serious and irreparable. The risk of ULA forcing employees to forsake their religious beliefs and health far outweighs any harm that the injunction may cause. Any claim that the vaccine mandate had to go into effect by October 29 (and then, November 7 for those salaried Plaintiffs whose appeal was denied, and some yet unspecified future date for union employees whose grievances are still pending) rings hollow; ULA has operated since spring 2020 without such a mandate and there is no compelling reason why it cannot continue doing so for enough time to engage in the interactive process required by federal law. Had ULA engaged in this process, it would have likely identified countless other ways to accommodate Plaintiffs while also protecting public health—working remotely, mask wearing,

periodic antibody testing, and periodic COVID testing are just a few options. Plaintiffs do not claim that ULA must allow them to work without any mitigation measures. Rather, Plaintiffs merely ask the Court to require ULA to follow federal and Alabama law, engage in the interactive process, and develop reasonable accommodations that consider Plaintiffs' religious beliefs and health concerns on the one hand, and the public's health interests on the other hand. Requiring ULA to comply with federal and Alabama law does not impose a harm that outweighs Plaintiffs' irreparable injuries.

While ULA will likely argue that safety concerns over COVID-19 create a harm for the company in the case of an injunction, this argument fails. Setting aside the fact that ULA's COVID-19 safety precautions have lessened over time, not increased, ULA: (1) does not require its customers to be vaccinated; and (2) does not require its vaccinated employees to be tested periodically for COVID, even though the CDC has acknowledged that the existing vaccines do not prevent reinfection or transmission; and (3) does not even require its vaccinated employees to wear masks, social distance, or be temperature checked before entering facilities where they will be in close contact with other employees.  Thus, even assuming it is appropriate for ULA to require vaccinations, there is no safety justification that can support a blanket policy that fails to take individual situations into account. Perhaps that is why federal law requires ULA to engage in the interactive process with the requesters in the first place.

**E. Granting the injunction will serve the public interest.**

An injunction preserving the status quo while the EEOC considers Plaintiffs' claims will also serve the public interest, which lies with enforcing the guarantees enshrined in the Constitution and federal anti-discrimination law. For example, allowing employees to exercise religious freedom by making decisions in accordance with their sincerely held religious beliefs is a public interest of the highest order. "Religion is the first of our rights under the First

Amendment and the Bill of Rights. The right to the free exercise of religion is a precious American invention . . . to be jealously guarded. It is the right of a human being to respond to what that person's conscience says is the dictate of God." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). The value of religious freedom has been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972). *See also Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 245 (N.D.N.Y. 2019) ("The public interest generally supports granting a preliminary injunction where . . . a plaintiff has established a clear likelihood of success on the merits and made a showing of irreparable harm.").

To be sure, there is also an important public interest in fighting the spread of COVID-19. "But there is an equally strong public interest in a citizen's free exercise of religion" in being able to maintain his employment without compromising his religious beliefs. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part and dissenting in part), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

Recognizing the centrality of religious freedom to the public interest, other courts— including the Supreme Court—have protected religious exercise even in the face of competing public health considerations. *See*, *e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (ordering preliminary injunctive relief against COVID-19 public health order restricting religious exercise); *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (same); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (same); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889 (2020) (same); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (same). The Supreme Court has admonished lower courts that "[e]ven in a pandemic," religious freedom "cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68.

Protecting that guarantee through injunctive relief serves a vital public interest.

The same is true of allowing individuals to make medical choices—in consultation with their doctors—to protect their health. As early as 1891, the Supreme Court recognized, in holding that a court could not force a plaintiff to submit to a surgical examination as to the extent of the injury sued for, that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). No law permits United to interfere with that right—indeed, the ADA exists to ensure it cannot do so. The Supreme Court has recognized the right to medical decision-making even in the face of countervailing societal interests. *See Winston v. Lee*, 470 U.S. 753, 766 (1985) (recognizing a right to medical decision-making and holding that a court could not force a defendant, for evidentiary purposes, to have surgery to remove a bullet fired by a victim). The public interest in allowing individuals to determine their need for a medical accommodation is particularly strong as the countervailing interest in stopping the spread of COVID-19 can be achieved through other means such as mask wearing and testing. Indeed, the ADA protects such decision-making by requiring an employer to provide reasonable accommodations. As another Circuit recognized, "[i]n enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." *Enyart v. Nat'l Conf. of Bar Exam'rs*, 630 F.3d 1153, 1167 (9th Cir. 2011). Many district courts have recognized a public interest in enforcing the ADA. *See, e.g.*, *Ramsay v. Nat'l Bd. of Med. Exam'rs*, No. 19-CV-2002, 2019 WL 7372508, at *19 (E.D. Pa. Dec. 31, 2019), *aff'd*, 968 F.3d 251 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1517 (2021) ("It is obviously in the public interest that the dictates of the ADA . . . be followed—Congress so decreed by passing [the] statute[].""); *Lyon v. Illinois High Sch. Ass'n*, No. 13-CV-00173, 2013 WL 140926, at *5 (N.D. Ill.

Jan. 10, 2013), as amended (Jan. 11, 2013) ("The general public has a clear interest in protecting the rights of the disabled; and by providing this disabled individual with the reasonable accommodations to which he is entitled under the law, the interests of the public are furthered."). This Court should hold, consistent with other courts, that there is a public interest in enforcing the ADA to protect the rights of disabled individuals. *See*, *e.g.*, *Enyart*, 630 F.3d at 1167 (noting "the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability"); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 476, 481 (E.D. Pa. 1998) ("It is clearly in the interest of the public to enforce the mandate of Congress under the [ADA].").

The public also has an interest in ULA's disabled employees retaining both their employment and their right to make their own medical decisions because "[t]he public has an interest in the full participation of the disabled in the economic, social and recreational life of the community." *Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1383 (N.D. Ga. 2002) (citation omitted). ULA's discriminatory policy runs contrary to that interest by forcing its disabled employees out of the workforce—potentially for years. This decision will have devastating economic consequences for Plaintiffs and those similarly situated, and those economic impacts affect the community at large.

To be sure, ULA will likely argue that an important public interest in eradicating COVID-19 outweighs Plaintiffs' religious beliefs and medical concerns. Plaintiffs do not dispute the important goal of stopping COVID-19's spread, but it does not override ULA's obligations under federal law. And it certainly does not allow ULA to terminate all employees who requested an accommodation. A large percentage of ULA's employees have already received a COVID-19 vaccine or have natural immunity from a prior COVID infection. Moreover, a large portion of the public likely possesses antibodies against COVID-19 due to previous infection. This Motion thus asks the Court to enjoin ULA's mandate for employees seeking accommodations for religious or

medical reasons, and the public interest is not to the contrary.

## CONCLUSION

Plaintiffs ask this Court to preserve the status quo by allowing the EEOC to continue reviewing Plaintiffs' administrative charges regarding ULA's unlawful conduct. Specifically, to prevent irreparable harm, the Court should enjoin ULA from terminating, or deeming as "voluntarily resigned", any employee who has a religious or medical basis for seeking an accommodation. Should any of the Plaintiffs be considered terminated already, Plaintiffs ask this Court to use its supplemental jurisdiction to order them to keep paying them in accordance with Alabama Act 2021-561 § 1(h). *See* Complaint Ex. A. By granting temporary preliminary relief, the Court will ensure that the EEOC and this Court will be able to order meaningful relief later, as warranted by law.

November 12, 2021                                    Respectfully submitted,


                                                    /s/ Matthew J. Clark
                                                    Matthew J. Clark
                                                    Alabama Bar No. 3788-Q61X
                                                    matt@alabamalawandliberty.org
                                                    ALABAMA CENTER FOR LAW & LIBERTY
                                                    2213 Morris Avenue
                                                    Birmingham, AL 35203
                                                    Telephone: (256) 510-1828


                                                    /s/ John C. Eastman
                                                    John C. Eastman*
                                                    Cal. Bar No. 193726
                                                    jeastman@ccg1776.com
                                                    CONSTITUTIONAL COUNSEL GROUP
                                                    174 W. Lincoln Ave, #620
                                                    Anaheim, CA  92805
                                                    Telephone: (909) 257-3869
                                                    Facsimile: (714) 844-4817

                                                    * *Pro hac vice* motion forthcoming

                                                    *Counsel for Plaintiffs and the
                                                    Proposed Class*

                                                    25

<u>**CERTIFICATE OF SERVICE**</u>

Despite this motion being filed *ex parte*, I hereby certify that on November 11, I emailed

the following, offering to talk before we filed this motion; and after not hearing a response,

emailed a copy of the foregoing to the following on November 12 after filing:

Sondra K. Barbour
General Counsel, United Launch Alliance
sondra.k.barbour@ulalaunch.com

<u>*/s/* Matthew J. Clark</u>
Matthew J. Clark

Counsel for Plaintiffs